UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                          :
JOEL J. BRANFORD,                                         :
                                                          :
                                       Movant,            :
                                                          :
                  -against-                               :
                                                          :
UNITED STATES OF AMERICA,                                 :
                                                          :
                                       Respondent.        :
                                                          :
------------------------------------------------------------------ X

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                 │
│ DOCUMENT                                  │
│ ELECTRONICALLY FILED                      │
│ DOC #: _____                    │
│ DATE FILED: 5/23/2023                     │
└─────────────────────────────────────────┘
```

1:22-cv-1264-GHW
1:14-cr-225-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

## I.   INTRODUCTION

Joel J. Branford is an international drug trafficker who arranged for the shipment of huge amounts of cocaine to the United States and around the world from his base in Panama.  Over three years passed between his arrest and his eventual guilty plea, as Mr. Branford, and his numerous lawyers, litigated the case up to the verge of trial.  At sentencing, Mr. Branford challenged the contention that the Government had, in fact, seized the cocaine that he had pleaded guilty to transporting.  Despite witness testimony, the 100 plus kilos of bricks of physical cocaine tested after the seizure, and a recording of Mr. Branford discussing the seized cocaine, his lawyer argued that the container containing the cocaine was on board an entirely different ship.  After a *Fatico* hearing, the Court found that the Government had indeed seized the cocaine, and sentenced Mr. Branford to 168 months of imprisonment—a sentence that was upheld on appeal.

Mr. Branford now challenges his conviction and sentence on several grounds.  While his petition raises several arguments—ineffective assistance of counsel, *Brady* violations by the Government, and his asserted actual innocence—at base, Mr. Branford's petition relies principally on the factual issue that he litigated during his *Fatico* hearing.  He argues that alleged discrepancies in

shipping records show that the container containing the cocaine seized by the Government was actually on board another vessel.  Thus, Mr. Branford argues, because his lawyers failed to find evidence that proved that there was no cocaine, they conducted an ineffective investigation; because the Government prosecuted him notwithstanding the prosecutors' alleged "reasonable" knowledge that there was no cocaine, the prosecutors violated *Brady*; and, notwithstanding his own sworn guilty plea and his recorded voice discussing the seized shipment of cocaine, Mr. Branford is actually innocent.

The Court evaluated the factual predicate for this argument during a *Fatico* hearing and found it to be unsupported.  Because Mr. Branford's petition does not provide sufficient information to suggest that his counsel was ineffective or that he is actually innocent, and because he has waived any right to contest his sentence on the basis of a *Brady* violation, his petition his denied.

## II.    BACKGROUND

### A.    The Investigation, Indictment, Arrest and Extradition[1]

This case grew out of a broader investigation by the Drug Enforcement Agency (the "DEA") regarding the smuggling of narcotics from Panama to the Port of New York and New Jersey (the "Port").  Presentence Report, Dkt. No. 265 at ¶¶ 9-16.  The Port is the busiest on the Eastern seaboard of the United States.  But despite the various safeguards put in place at the Port, it was being used as a transshipment point for narcotics from around the world—particularly Panama. *Id.* ¶¶ 14-16.

In January 2010, law enforcement searched a Maersk vessel—the *Schubert*—and discovered a shipment of cocaine on board.  *Id.* ¶¶ 17, 19.  The cocaine was seized by the Government.  *Id.*  Law enforcement focused on the involvement of Mr. Branford in the conspiracy in part because of an

---

[1] All citations to the docket refer to the criminal case unless otherwise noted.

intercepted conversation between a co-conspirator and Mr. Branford.  In the call, as will be discussed later, Mr. Branford threatened his co-conspirator because he believed that he had stolen the cocaine from the vessel.  *Id.* ¶ 20.

The indictment in this case (the "Indictment") was filed on April 2, 2014.  Dkt. No. 3.  The Indictment contained two counts.  Count I charged Mr. Branford with participating in a conspiracy to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. § 846.  Count II charged him with participating in a conspiracy to important import five kilograms and more of cocaine into the United States, in violation of 21 U.S.C. § 846.  Dkt. No. 3.

Mr. Branford engaged in his criminal conduct from outside of the United States.  He was arrested in Costa Rica on April 6, 2014.  *Id.* ¶ 24.  He was extradited to the Southern District of New York on January 22, 2015.  *Id.*  He was arraigned shortly thereafter.  Dkt. No. 9.  Thus started the long path to Mr. Branford's eventual guilty plea and sentencing.

### B.    Legal Counsel

One striking theme of the case as it progressed was Mr. Branford's many changes of counsel over the life of the case.  Over the life cycle of his criminal case, some 12 lawyers entered appearances for Mr. Branford:  some retained by Mr. Branford, some appointed by the Court.  Each change in counsel was implemented at Mr. Branford's request—usually, as will be seen, shortly after any adverse ruling by the Court.  Mr. Branford took many opportunities to exercise his right to change his counsel.  As a result, when it comes to the ineffective assistance of counsel claim at issue in this petition, it is difficult to deduce which lawyer Mr. Branford claims to have been ineffective.

### C.    The Wiretap Suppression Hearing

On August 17, 2015, Mr. Branford filed a motion to suppress evidence, including Title III wiretap evidence.  Dkt. No. 18.  The motion was filed by Mr. Branford's first, retained, counsel, Anthony Ricco.  In support of the motion, Mr. Ricco filed an affidavit acknowledging that the

"voice of Joel Branford was intercepted in connection with the expected delivery of over one hundred kilograms of cocaine expected to arrive secreted in a container aboard a shipping vessel near the end of January 2010."  Dkt. No. 35.

While the motion was pending, Mr. Branford terminated Mr. Ricco as his counsel.  In his motion requesting leave to withdraw, Mr. Ricco wrote that "the government provided a substantial volume of Rule 16 discovery materials in this case.  The defense has reviewed the Rule 16 discovery materials and as a result thereof has, in fact, filed substantive pre-trial motions . . . . Notwithstanding the above efforts, Joel Branford has exercised his right to counsel and has terminated my services as counsel and has now retained attorney Harry Joel Slovis . . . ."  Dkt. No. 42.

Thus, when the Court held a suppression hearing with respect to the motion on January 28, 2016, Mr. Branford was represented by Mr. Slovis.  *See* January 28, 2016 Hearing Tr. ("Suppression Hearing Tr."), Dkt. No. 56.  The hearing focused on the admissibility of a January 9, 2010 call intercepted through a Title III wiretap.  In the call, Mr. Branford and a co-conspirator discuss the missing cocaine that had been seized by law enforcement from a container ship at the Port.  Mr. Branford discusses the Maersk line.  Dkt. No. 196-2 ("The info, the info you're giving me is not the same info that I got on the computer 'cause I got this n***a I got the . . . like the bosses of the Maersk line . . . .  That's my n***a.  Like he be . . . traveling all over and sh*t and that's who I get my info from.").  Mr. Branford later threatens his co-conspirator as a result of the missing cocaine.  The recording was damning evidence that Mr. Branford understandably wanted to suppress.

But in order for Mr. Branford to suppress the call, he had to demonstrate that he had standing to do so.  And to demonstrate his standing, Mr. Branford had to acknowledge that the

voice on the recording, talking about missing "work,"[2] shipments on the Maersk line, and

threatening his co-conspirator was his.  Thus, during the hearing, Mr. Branford's counsel examined

him under oath as follows:

> MR. SLOVIS:  On January 29, were you on a call with a person on the other end of
> the phone?
> THE DEFENDANT: Yes.
> MR. SLOVIS:   It was your voice?
> THE DEFENDANT:  Yes.
> MR. SLOVIS:  And you heard the tape.  Have you heard it?
> THE DEFENDANT:  I got the tape on November 13.
> MR. SLOVIS:  And that's you, correct?
> THE DEFENDANT:  Yeah.

Suppression Hearing Tr. at 17:11-24.

Although the Court concluded that Mr. Branford had standing to challenge the wiretap, the

Court denied Mr. Branford's motion.  *Id.* at 23:7.  But for purposes of this motion, Mr. Branford

testified under oath that he talked with a co-conspirator about "work"—drugs—on a Maersk

shipment, and threatened the co-conspirator who told him that the drugs were missing.

The Court denied the motion to suppress on January 28, 2016 and scheduled trial to begin in

June of 2016.  *See generally* Suppression Hearing Tr.  Two days later, Mr. Branford wrote the Court

*pro se*, asking that the Court relieve his retained counsel and appoint counsel under the Criminal

Justice Act (the "CJA").  Mr. Branford asserted that he did not believe that his retained counsel had

his best interest in heart and that Mr. Branford was indigent.  Dkt. No. 52.  On February 11, 2016,

the Court appointed Mr. Rosenberg as counsel for Mr. Branford, Dkt. No. 53, and later, after

conducting a *Curcio* hearing, authorized the appointment of a second CJA counsel, Clara Kalhous, to

represent him as well.  Dkt. Nos. 64, 65.

---

[2] One slang meaning of the word "work" is "a drug[;] it could be crack or cocaine."  Urban Dictionary
(https://www.urbandictionary.com/define.php?term=work&page=2) (last visited May 18, 2023).

On May 4, 2016—now a little over a month before the scheduled trial date—Mr. Branford's counsel wrote asking for a change of counsel because "Mr. Branford lacks confidence in his attorneys and . . . there are fundamental disagreements in the handling of his case."  Dkt. No. 68.  After two conferences about the request, the Court granted Mr. Branford's request and appointed Robert Radick as Mr. Branford's new attorney.  Dkt. No. 71.  Mr. Branford was fortunate, in that Mr. Radick came into the case not only by himself but with several fellow attorneys from his law firm, Morvillo Abramowitz Grand Iason & Anello P.C.:  Lawrence Bader and Priya Raghavan entered notices of appearance on Mr. Branford's behalf.  Dkt. Nos. 73-74.  As part of the transition, the Government affirmed that it had turned over all of the discovery in its possession.  Dkt. No. 71 at 6:19-20.  It had only recently received some information from Panamanian officials, but the remainder had been turned over well before.  *Id.*  The Court adjourned the trial to December 5 to allow new counsel to get up to speed and to accommodate their schedules.  *Id.* at 10:24-11:11.

### D.   Additional Motion Practice and the *Pro Se* Motion to Dismiss

On September 2, 2016, the Court granted a request by Mr. Branford's new counsel to adjourn the trial to April 10, 2017, in part to permit the defense to file two additional pre-trial motions that had not been pursued by his prior counsel.  Dkt. No. 85.  Those two additional authorized motions were submitted on September 23, 2016.  Dkt. No. 87.  The first motion sought the suppression of additional evidence—cocaine, firearms, and approximately $70,000 that was seized from Mr. Branford's Virginia apartment in 2003 pursuant to a search warrant.  He also moved to compel information regarding the identification of Mr. Branford.  *Id.*  On November 28, 2016, after full briefing and the opportunity for argument, the Court denied those motions.  Dkt. No. 107.

Mr. Branford filed a separate *pro se* motion on September 20, 2016.  Dkt. No 86.  The *pro se* motion sought to dismiss the Indictment.  But because Mr. Branford was represented by counsel at the time, and defendants are not entitled to so-called "hybrid" representation, the Court denied the

motion without prejudice and gave Mr. Branford and his counsel additional time to consider whether to file a motion to dismiss through counsel or to present argument regarding why the Court should consider the *pro se* motion.  Dkt. No. 94 at 7:24-8:16.  They never did.

On December 6, 2016, shortly after resolving Mr. Branford's additional motions, the Court scheduled trial to begin on April 10, 2017.  Dkt. No. 107.  On December 16, 2016, notwithstanding Mr. Branford's prior assertions regarding his indigence, James Kousouros—newly retained counsel for Mr. Branford—entered a notice of appearance in the case.  Dkt. No. 110.  The Court held a conference on December 28, 2016 to discuss the proposed change in counsel.  Dkt. No. 115.  At the conference, Mr. Branford confirmed that he wanted to terminate his CJA counsel and to replace them with Mr. Kousouros.  And Mr. Kousouros confirmed that he was prepared to go forward with a trial date in April of the next year.

Mr. Kousouros vigorously litigated the case.  He filed another motion to suppress additional evidence on February 21, 2017.  Dkt. No. 117.  And on March 3, 2017, the Court held a status conference to discuss discovery materials that had recently been produced from a foreign country. At the parties' request, the Court again adjourned the trial to July to permit Mr. Branford and his counsel ample time to review the additional discovery.  *Id.* at 9:15-22 ("THE COURT:  Throughout the history of this case, I have been in my view very considerate of Mr. Branford's requests for extensions of time and understanding of his requests to change counsel, which resulted in adjournments to date.  I'm not going to change course now, meaning I'm going to continue with the same approach to Mr. Branford's case and grant an extension of time as he's requested . . . .").

In the buildup to the trial, the parties presented additional briefing from the defendant, and pretrial submissions, including requests to charge by all parties.  Dkt. Nos. 134-140.  On April 24, 2017, the Court denied Mr. Branford's additional motion to suppress.  Dkt. No. 147.

### E.    Change of Plea

On June 19, 2017, as the parties were working toward the July 17 trial date, the Government

informed the Court that it was in active plea discussions with Mr. Branford.  Dkt. No. 151.  On June

22, 2017, the Court held a change of plea hearing.

Mr. Branford pleaded guilty to Count II of the Indictment pursuant to a plea agreement with

the Government (the "Plea Agreement").  In the Plea Agreement, Mr. Branford agreed to plead

guilty to Count II of the Indictment.  In it, Mr. Branford expressly acknowledged "that he has

accepted this Agreement and decided to plead guilty because he is in fact guilty."  He agreed with

the Government that his offense involved at least 50 kilograms but less than 150 kilograms of

cocaine and that he had possessed a dangerous weapon in connection with the offense—as a result,

he agreed, the stipulated guidelines range for his offense was between 135-168 months

imprisonment.

Mr. Branford also agreed to waive his rights to appeal his sentence, or to challenge it under

18 U.S.C. § 2255, provided that his sentence fell within that guidelines range.  He also categorically

agreed to waive his right to challenge his conviction and sentence on the basis of any failure by the

Government to provide him with any discovery materials:

> By entering this plea of guilty, the defendant waives any and all right to withdraw his
> plea or to attack his conviction, either on direct appeal or collaterally, on the ground
> that the Government has failed to produce any discovery material, Jencks Act
> material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other
> than information establishing the factual innocence of the defendant, and
> impeachment material pursuant to *Giglio v. United States*, 405 U.S. 105 (1972), that has
> not already been produced as of the date of the signing of this Agreement.

During the change of plea hearing, the Court assessed the defendant's competency to enter

the plea, and reviewed his rights.  *See* June 22, 2017 Hearing Tr. ("Plea Hearing Tr."), Dkt. No. 157.

The Court also confirmed with Mr. Branford that he was satisfied with Mr. Kousouros'

representation of him.  *Id.* at 6:5-7.  During the change of plea hearing, the Court reviewed the

nature of the charge to which Mr. Branford sought to plead guilty with him, and the Government

outlined all of the elements of the charged offense. *Id.* at 11:3-12:13. Among the factors outlined by

the Government was that it "would also have to prove by a preponderance of the evidence that

venue is proper here in the Southern District of New York." *Id.* at 12:11-13. The Court reviewed

the sanctions associated with the crime to which Mr. Branford expected to plead guilty before

turning to a discussion of the Plea Agreement.

Mr. Branford stated that he had reviewed the Plea Agreement with Mr. Kousouros, that he

understood the agreement, and had signed it. *Id.* at 19:1-17. The Court specifically reviewed the

waivers of Mr. Branford's right to appeal or pursue habeas relief as a result of his conviction and

sentence. *Id.* at 20:22-22:3. The Court read the language in the Plea Agreement containing his

waivers of the right to challenge his conviction and sentence, including the waivers of Mr.

Branford's opportunity to pursue a *Brady* claim:

> THE COURT: . . . Furthermore, you have agreed to waive your right to withdraw
> your plea or attack your conviction, either on direct appeal or collaterally, on the
> ground that the United States has failed to produce any discovery material, Jencks
> Act material, exculpatory material, pursuant to <u>Brady v. Maryland</u>, other than
> information establishing your factual innocence, and impeachment material, pursuant
> to <u>Giglio v. United States</u>, that has not already been produced as of the date of
> signing of the agreement. . . . Mr. Branford, do you understand these rights to appeal
> or otherwise challenge your conviction and sentence and its effects as set forth in the
> plea agreement?
>
> THE DEFENDANT: I've understood.

*Id.* at 21-22.

Before pleading to the charged offense, Mr. Branford made the following statements under

oath: "THE DEFENDANT: Your, Honor, I'm agreeing that I knowingly and intentionally, along

with others, imported more than five kilograms of cocaine into the United States from Panama.

THE COURT: Thank you. When you did that, Mr. Branford, did you know that what you were

doing was wrong and illegal? THE DEFENDANT: Yes, your Honor." *Id.* at 23:4-11.

The Court turned to the United States to ask whether there were additional questions that it would like the Court to ask the defendant "beginning with, is there a proffer with respect to the venue in this district?"  *Id.* at 23:19-22.  The Government proffered that "there were a number of acts taken by the defendant's coconspirators in the Southern District of New York, including coconspirators who traveled to the Southern District of New York to retrieve the narcotics that were shipped to the Port . . . .  Additionally, it's our understanding that the narcotics themselves en route to the Port . . . passed through the waters of the Southern District of New York."  *Id.* at 23:25-24:8.  The defendant's counsel accepted the Government's proffer as to venue.  *Id.* at 24:12-15.  The Court then accepted Mr. Branford's plea.  Frequently, that would be the end of the story until sentencing.  It was not.

### F.    Request to withdraw guilty plea

For on July 2, 2017, the defendant wrote a letter taking issue with his plea.  Dkt. No. 153. He requested, among other things, that he be allowed to withdraw his plea and claimed that Mr. Kousouros, his third retained counsel, had been ineffective.  In his July 2, 2017 letter, Mr. Branford made an argument based on a "bill of lading, *which was disclosed during discovery . . . .*"  *Id.* (emphasis added).  He wrote that "there was no way the container was ever in New Jersey, which is where the Government alleges the narcotics that entered Manhattan originated."  *Id.*

The Court held several conferences in response to the letter, and appointed, on two separate occasions, two different independent counsel, Paula Notari and Donald J. Yannella, to advise Mr. Branford on his potential application to withdraw the plea.  Dkt. Nos. 164, 169.  While that process was underway, on October 2, 2017, a new retained lawyer, Christopher Cassar, entered a notice of appearance on behalf of Mr. Branford in the case.  Dkt. No. 168.  And during a conference held on October 11, 2017, the Court granted both Mr. Kousouros and Mr. Yannella leave to withdraw as

counsel for Mr. Branford.  The Court scheduled briefing on any motion to withdraw Mr. Branford's plea.  Dkt. No. 171.

A motion to withdraw Mr. Branford's plea was filed on November 10, 2017.  Dkt. No. 176. But his counsel requested leave to file an updated motion, which was filed by his counsel on December 26, 2017.  Dkt. No. 195.  The principal argument presented in the motion was that Mr. Kousouros, Mr. Branford's prior counsel, had provided him ineffective assistance of counsel in connection with his guilty plea.  He also argued that his plea had not been voluntary, knowing and intelligent because the Government had misrepresented venue-related facts at the change of plea hearing.  The updated motion to withdraw Mr. Branford's plea attached a number of shipping documents that had been provided by the Government to the defendant.  Dkt. No. 195-2, 195-3. Those documents comprise nearly all of the documents submitted to the Court by Mr. Branford in connection with his *habeas* petition, which establishes that Mr. Branford and his counsel had those materials no later than that date.  *Compare* Dkt. No. 272.  Some of the same documents were affixed to the Government's opposition to the motion to withdraw, which was filed on January 16, 2018. Dkt. No. 196.

On March 1, 2018, after briefing on the motion, the Court held a hearing with respect to Mr. Branford's motion to withdraw his plea of guilty.  *See* Dkt. No. 202.  During the hearing, the defendant did not offer evidence to the Court.  *Id.* at 4:1-5.  But the Government called Mr. Kousouros, who described his discussions with the defendant.  Having heard the evidence, the Court denied the motion.  Among other things, the Court specifically found that "Mr. Branford's plea was knowing and intelligent."  Dkt. No. 212 at 26:9-10; 28:8-19.  The Court also concluded, among other things "that Mr. Kousouros' assistance in connection with Mr. Branford's guilty plea did not fall below an objective standard of reasonableness."  Dkt. No. 202 at 49:6-11.  Thus, the Court concluded that "Mr. Kousouros did, in fact, provide effective assistance" with respect to the

issues raised by Mr. Branford.  Dkt. No. 212 at 26:16-17.  The Court denied Mr. Branford's motion

to withdraw his plea.  The Court then scheduled a date for Mr. Branford's sentencing.

> ### G.   Branford Changes Counsel Again

On May 13, 2018, shortly after losing the motion to withdraw his guilty plea, Mr. Branford

wrote the Court another *pro se* letter.  Dkt. No. 216.  The letter raised a number of concerns about

his counsel—in particular regarding a subpoena that his counsel had recently sent to Maersk

requesting shipping records.  The subpoena attached a number of screenshots tracking the path of

the container ships to the Port.  They are those that were attached to the motion to withdraw the

plea, and that were provided by Mr. Branford to the Court in connection with this *habeas* petition.

The Court held a conference to discuss the letter on May 29, 2018.  Mr. Cassar explained

part of a misunderstanding by Mr. Branford that had prompted his letter:

> MR. CASSAR:  Judge, Mr. Branford has indicated as to the May 13th letter, he feels
> that some of the subpoenaed material would have had some impact on some
> relevance to the hearing.  Now, I've discussed that May 13th letter with Mr.
> Branford, Judge.  And he seems to be under the impression that the documents
> attached to the subpoena were, in fact, provided pursuant to the subpoena. . . .
> Those documents I had provided to Maersk to assist them in locating the
> documents. . . .  These were the documents that I had actually provided to Maersk to
> assist them in locating the documents.  Now, after it was served by UPS on Maersk,
> they had called my office and spoke to my office and told us that they didn't have
> any records.
>
> THE COURT:  Thank you.  Understood.  Let me just take a moment just to confirm
> one thing.  Just to frame my review of this, the documents that are attached to the
> subpoena are amongst the documents that were provided in connection or prior to
> Mr. Branford's guilty plea.  Is that correct? . . . .
>
> AUSA ABRAMOWICZ:  Your Honor, I believe so.  Certainly documents from the
> shipping company were provided in discovery.  It's the first time I'm seeing these
> specific ones, so I can't compare them to those.  But I believe these are the same --
> these are among the documents that were provided in the discovery which occurred
> before the plea.
>
> THE COURT:  Thank you.

> MR. CASSAR: Judge, I was not counsel to Mr. Branford prior to the plea, so I cannot speak to that. However, these documents were provided by the government when Mr. Branford first made his request to vacate the plea on venue grounds. The government did send a letter with these documents to Mr. Branford's prior counsel, and that's how I obtained them.

Dkt. No. 222 at 8:24-10:14.

The Court responded to a portion of Mr. Branford's letter in which he expressed concern about the conduct of his counsel. Dkt. No. 216 ("Your Honor this repetitive Behavior by attorneys as to my case, when mentioned would seem as if the problem would be the defendant (me). As I have stressed out in numerous occasions, my intentions are only to have a fair Defense . . . ."). The Court reviewed the history of Mr. Branford's termination of counsel. Among other comments by the Court, it stated:

> THE COURT: So in this context, Mr. Branford, I do not know what more I could do to provide you with reassurance that you are obtaining competent counsel here. You've been represented by four sets of attorneys of your choosing. You have been represented by, in addition, Mr. Rosenberg and Ms. Kalhous under the CJA act. You were also represented by Mr. Radick and his colleagues from the Morvillo Abramowitz firm under the CJA act. So over the course of the many years that this case has been pending, there have been a number of extremely highly competent lawyers, both appointed by the Court or specifically obtained by Mr. Branford. None of them have apparently impressed Mr. Branford with their ability to provide him with adequate representation in the case. So I do not know at this point what more I can do to help provide him with comfort, having already endorsed the retention of two sets of CJA lawyers and presided over the case while four privately retained sets of counsel have represented Mr. Branford. Many of these lawyers are the cream of the New York federal defense bar. So if Mr. Branford wants to make an additional motion to the Court separate and apart from the upcoming sentencing, I'd ask that you please bring that clearly to my attention again.

Dkt. No. 222 at 13:15-14:13. The Court scheduled a sentencing hearing.

Before sentencing, a new retained lawyer appeared in the case—Bruce Barket. Dkt. No. 217. He requested an adjournment of the sentencing.

H.     *Fatico* hearing

Before the sentencing, Mr. Branford lodged a number of objections to the presentence report.  Notwithstanding the fact that he had agreed that his offense involved between 50 and 150 kilograms of cocaine in the Plea Agreement, he disputed the application of a drug-weight enhancement.  Dkt. No. 238.  Now, Mr. Branford asserted, the drug seizure never happened.  The Court held a *Fatico* hearing[3] on August 27, 2018 to resolve the disputed issues.  Dkt. No. 249 ("Sentencing Tr.").

During the *Fatico* hearing, the Government called two witnesses:  John Scherbenske, a group supervisor with the DEA, Peter Didato an agent with Homeland Security Investigations ("HSI").  Agent Scherbenske testified about a 2003 search of Mr. Branford's apartment in which they located among other things just under half of a kilogram of cocaine, drug ledgers, and two firearms.  *Id.* at 15:19-25.  He explained that following the search, law enforcement attempted to locate Mr. Branford to arrest him in connection with the evidence seized during the search.  But Mr. Branford was not located in the United States.  "The U.S. Marshals believed that he was in Panama."  *Id.* at 27:9-10.

Agent Didato testified at length regarding the drug search of the container ship containing cocaine that was tied to Mr. Branford's offense.  A graduate of the U.S. Merchant Marine Academy, Agent Didato had experience working in the maritime industry before joining HSI in 2006.  The search occurred on January 27, 2010.  *Id.* at 32:11.  Agent Didato testified that his agency was investigating narcotics hidden in cargo containers.  *Id.* at 31:2-3.  Law enforcement targeted a vessel that was arriving from Panama—the *Schubert*.  *Id.* at 32:16-22.  Agent Didato inspected containers on that vessel.  He testified that he looked at several containers, which had been flagged by a colleague

---

[3] A hearing to resolve disputed issues of fact in connection with a sentencing, so-named in this Circuit as a result of the Second Circuit's decision in *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979).

based on a tip from the DEA.  *Id.* at 34:7-16.  In one, HSI found multiple bricks of cocaine.  A lab report concluded that the agency had recovered 100.4 kilograms of cocaine, of which 77.1 kilograms contained pure cocaine.  *Id.* at 43:24; 74:16-17.

Mr. Branford's counsel, Mr. Barket, cross-examined Agent Didato.  Mr. Barket asked the agent about the lab results showing the weight of the cocaine that had been seized.  *Id.* at 45:4-47:9.  Then Mr. Barket introduced two exhibits that he presented to the agent.  Mr. Barket described one of the exhibits as "a package of material that I guess we were given by the government . . . .  It concerns the container number, the shipping information, and I believe the seal number."  *Id.* at 48:11-15.  Mr. Barket asked the witness questions about the container number shown on a Maersk document and then moved in two exhibits that contained Maersk shipping documentation.  *Id.* at 51:4-9 ("MR. BARKET:  It is also discovery from the government. . . .  These are documents from Maersk line, which is the shipping company that shipped the container.  And it is the same computer printout screens that the agent alluded to before.  Again, the paperwork that follows the boxes.").

On re-direct, the Government asked Agent Didato about references in those exhibits to other vessels, including the *Maersk Bogor* and the *Maersk Dolores*.  The Government asked Agent Didato if the *Maersk Dolores* was the ship that he searched, and Agent Didato testified that he did not think that it was.  Instead, he testified, the name of the vessel on which he found the cocaine was the *Schubert*.  *Id.* at 53:1-12.

Mr. Barket argued at the end of the hearing that the documents that he had presented to the Court showed that the drugs were not seized on the vessel.   He argued that "some of the facts that are in this paperwork seems to contradict not only whether or not there were drugs seized on a certain date, January 27, 2010, but whether or not that container was actually shipped on and received in that port on that date."  *Id.* at 59:4-8.  Mr. Barket argued that the documents provided by the Government "concerning the container that the agent testified he seized the drugs from . . .

indicates this box or container number was actually received in Newark's port on January 13th, which would be two weeks earlier and on a different ship as was noted by the Government in its redirect. It was on the Dolores." *Id.* at 59:14-19. The Court and Mr. Barket engaged in a lengthy exchange regarding the asserted discrepancies in the documents that had been presented to the Court by the defense. *Id.* at 59-65. And the Government argued about the meaning of the asserted deficiencies identified by counsel for Mr. Branford, including the following:

> [T]here is no problem in the paperwork . . . . Looking at the defense's own exhibits if we look at Defense Exhibit A and the page with the Bates stamp ending in 256, this information is entirely consistent with what Special Agent Didato testified about. There is a container number at the top that is the same container number that Special Agent Didato said was the number on the container found to contain cocaine. If you look toward the bottom of this page ending in 256, it indicates that the Schubert vessel, so that is the ship that Special Agent Didato testified the container was on, that it left the Balboa port terminal in Panama on or about January 19th, 2010 and that it was discharged from APM terminal in Newark, which is where Special Agent Didato testified the search occurred on January 27th, 2010, which is the date when Special Agent Didato testified that he found cocaine in the container.

*Id.* at 69:14-25; 70:1-5.

Following the *Fatico* hearing, the Court issued findings of fact regarding the disputed issues. The Court found Agent Didato's testimony to be credible. And the Court found, among other things, that Agent Didato had searched the *Schubert* as he had testified. *Id.* at 74:3-17. The Court found that law enforcement had recovered 77.1 kilograms of cocaine. *Id.* In reaching that conclusion, the Court recognized the defendant's arguments regarding asserted discrepancies in the shipping documentation. *Id.* at 75:1-7 ("THE COURT: Defendant points to a single page of Defense Exhibit A, which arguably references the container as being on board a vessel other than the *Schubert*, which arrived weeks before the law enforcement investigation. However, as I said[,] I fully credit the testimony of Agent Didato who testified that the container was on board the *Schubert* on the date that he stated.").

The Court also ruled against Mr. Branford regarding his other objections, finding that he had begun to traffic in narcotics well before the conspiracy for which he was convicted, based on the 2003 seizures from his apartment.  *Id.* at 77:1-11.[4]

## I.     The Sentencing

Sentencing followed immediately after the Court issued its decision regarding the disputed issues of fact.  Because Mr. Branford lied in the affidavit submitted in connection with his application to withdraw the plea, the Court found that an obstruction of justice enhancement was appropriate.  And because of Mr. Branford's conduct in the lead-up to sentencing, including his challenge to the drug calculation in his Plea Agreement, the Government did not move for a one level reduction in his offense level.  As a result, the Court found that the guidelines range for Mr. Branford was higher than that agreed to in his Plea Agreement—188 to 235 months imprisonment. *Id.* at 90:17-18.

During the sentencing hearing, in an attempt to seek the leniency of the Court, Mr. Branford again expressly accepted responsibility for his involvement in the crime:  "I would like to reiterate that I am accepting responsibility as to this current crime, this current situation and would like to be taken to a point where your Honor will be lenient."  *Id.* at 97:2-5.  "I am ashamed of myself at what is going on and I would really like your Honor to know that I will never put myself in a situation like this again." *Id.* at 97:9-11.  So, shortly after the Court rejected his argument that no crime had been committed because there was no cocaine, in order to advance his position, Mr. Branford again accepted responsibility for the crime.

---

[4] "THE COURT:  In particular, in approximately 2003 in Virginia, Branford was also involved in trafficking cocaine before he fled to Panama.  Notably, on December 2, 2003 a lawful search the Branford's residence in Richmond, Virginia was conducted and law enforcement agents recovered narcotics, more than $70,000 in cash, multiple firearms including a Mac-11 semi-automatic submachine gun, bulletproof vests and the book Hitman:  A Technical Manual for Independent Contractors.  The search also located a book instructing him how to build a silencer and information regarding Pablo Escobar and cocaine generally as well as a notebook containing information indicative of drug-selling activity."

During the sentencing hearing, the Government pointed to transcripts of conversations between Mr. Branford and a co-conspirator in which Mr. Branford discussed "how he oversaw the loading of the cocaine at the port.  The defendant credits himself as having this operation sewed up. He discusses his relationship with the shipping company [Maersk] he used for his unlawful business."  *Id.* at 99:5-15; s*ee also* Dkt. No. 235.  The Government also pointed to evidence of the Mr. Branford's involvement in trafficking drugs on other routes, and his possession of deadly weapons in support of an argument that the defendant should be sentenced within the parties' stipulated guidelines range.  The Court sentenced Mr. Branford to 168 months of imprisonment— the top of the parties' stipulated guidelines range.  *Id.* at 110:25; 111:1-2; 114:14-18.

### J.   The Appeal

Mr. Branford filed a notice of appeal on September 10, 2018.  Dkt. No. 248.  In that appeal, he raised three claims:  (1) that his guilty plea and appeal waiver were not knowing and voluntary; (2) that the district court should have permitted him to withdraw his guilty plea; and (3) that his guilty plea and appeal waiver did not waive certain "constitutional" arguments.  *See United States v. Branford,* 833 F. App'x 902, 903–04 (2d Cir. 2020).  The Second Circuit affirmed Mr. Branford's conviction. *Id.*

First, the court held that Mr. Branford's "appeal waiver and guilty plea were knowing and voluntary."  *Id.*  The court stated that, "[i]mportantly, if a defendant's guilty plea is knowing and voluntary, '[t]he cases are legion that a plea of guilty to an indictment is an admission of guilt and a waiver of all non-jurisdictional defects.'"  *Id.* (citations omitted).  The court also emphasized that, "Branford did not plead guilty blindly:  As his plea deal put it, Branford 'decided to plead guilty because he is in fact guilty.'"  *Id.* (citations omitted).  The court further held that the Court's denial of Mr. Branford's motion to withdraw his plea based on "ineffective assistance in advising Branford

18

about his guilty plea and (2) the district court lacked venue" constituted was not error by the Court, "let alone abused its discretion." *Id.*

The Second Circuit also rejected Mr. Branford's argument that Mr. Kousouros had failed to adequately investigate whether venue was proper and neglected to advise him on the subject. *Id.* The court further noted that Mr. Branford failed to identify "any jurisdictional defects in this case." *Id.* at 905. Notably, the court held that, when Mr. Branford "entered a knowing and voluntary guilty plea and appeal waiver," he waived "all other objections Branford advances on appeal, including his challenge to the government's wiretap evidence . . . and his contention that the indictment failed to state an offense when it alleged insufficient facts about the charged crime . . . Branford's explicit waiver of appeal also shuts to the door to any challenge to his sentence." *Id.* (citations omitted).

### K.     Mr. Branford's 2255 Petition

Mr. Branford filed a petition to vacate his sentence under 28 U.S.C. § 2255 timely on February 15, 2022 (the "Petition"). Dkt. No. 269. Mr. Branford presents three broad arguments in support of his claim for relief in his Petition. First, he asserts he received ineffective assistance of counsel. He argues that his rights were violated "due to his counsel's failure to investigate the government's evidence which allegedly supported that movant was involved with" the charged conspiracy. Petition at 4. As a result, Mr. Branford asserts, he was induced to enter a guilty plea "when there was substantial evidence which supported his lack of guilt to the charged offenses." *Id.* at 4, 15. Mr. Branford asserts that his counsel was deficient "because a reasonable investigation by counsel would have revealed the government's evidence was lacking in veracity concerning movant's guilt." *Id.*

Second, Mr. Branford asserts in his Petition that the prosecutors engaged in misconduct. That is because, Mr. Branford argues, "the prosecutor offered and allowed him to enter into a plea agreement when he knew or reasonably should have known that it falsely averred that it would have

to prove elements that it could not . . . ."  *Id.* at 6.  Thus, the thrust of Mr. Branford's argument is

that the prosecutors violated his rights by prosecuting him for a crime they could not prove.  *Id.*

("The prosecution's inducement to enter into a guilty plea with movant while knowing or reasonably

knowing that its charges were based on false evidence renders movant's guilty plea invalid.").  Mr.

Branford's Petition invokes *Brady* and *Giglio*, but does not describe what information was withheld

from him—instead, in the Petition, he argues that the Government knew of evidence that would

exculpate him, but withheld it, and that to protect itself, the Government "surrepticiously [sic]

plac[ed] a waiver of attacking movant's plea based on any exculpatory material or impeachment

evidence pursuant to <u>Brady</u> and <u>Giglio</u> . . . ."  *Id.*

Finally, Mr. Branford asserts that he is "actually innocent" of the offense.  *Id.* at 8.  He

claims that "the alleged cocaine was non-existent" and that "[c]lear evidentiary facts demonstrate

that no drugs were seized as alleged in movant's case as demonstrated through shipping records, and

manufactured evidence presented by the government."  *Id.*

The Government filed its opposition to the Petition on April 18, 2022.  Dkt. No. 271 (the

"Opposition").  The scheduling order governing the Petition required that Mr. Branford file any

reply to the Government's response within thirty days.  Dkt. No. 270 ("Movant shall have thirty

days from the date on which Movant is served to file a response.  Absent further order, the motion

will be considered fully submitted as of that date.").

Following the filing of the Opposition, Mr. Branford submitted a supplemental

memorandum of law in support of his Petition.  Dkt. No. 272 (the "Supplemental Memorandum").

Mr. Branford attached to the Supplemental Memorandum several shipping records that were

attached to prior filings in the case—including the filings at the time of his motion to withdraw his

plea, that were discussed at length during the May 2018 conference described above, and which were

used by his counsel to cross-examine a witness during the *Fatico* hearing.  In the memorandum, Mr.

20

Branford argues that the discrepancies between the redacted and unredacted versions of the exhibits he submitted, demonstrate "both counsel's ineffectiveness and the presentation of false evidence by the government."  *Id.* at 2.  Mr. Branford repeats the argument made by his counsel at the *Fatico* hearing that these documents show that the container containing cocaine was not on board the *Shubert* but was on board another vessel.  *Id.* at 3-4.  The thrust of his argument, again, is that the evidence does not support a finding that he was guilty because there was no cocaine.

Mr. Branford also filed a separate affidavit in support of the Petition on May 26, 2022.  Dkt. No. 275 (the "Affidavit").  In his Affidavit, Mr. Branford describes advice that he received from Mr. Kousouros advising him to plead guilty.  He notes the issue that he discovered after pleading guilty "concerning the court's venue . . . ."  Affidavit at 2.  The sequelae of Mr. Branford's concern about venue are outlined above.  It is notable that Mr. Branford did not note an issue with the factual premise for his plea—namely that he conspired to import cocaine into the United States:  his issue at that time was with whether the cocaine passed into the Southern District of New York, not whether it existed.

In his Affidavit, Mr. Branford also asserts that he was not provided copies of the shipping records attached to his memorandum until after he retained Mr. Cassar to raise the question of whether Mr. Kousouros has been ineffective.  *Id.*  Mr. Branford avers that he "did not see any of the aforementioned exhibits, and was not aware of the information they contained I immediately brought several serious discrepancies to the attention of attorney Cassar, and he agreed to raise these matters to the attention of the court in support of withdrawing my guilty plea."  *Id.*  Mr. Branford's Affidavit describes the *pro se* letter "raising the discrepancies" that provoked the May 2018 conference described above.  *Id.* at 2.  Mr. Branford then asserts that Mr. Barket, his lawyer at the time of the *Fatico* hearing, "only argued a discrepancy concerning essentially the DHS Agent Peter

Didato's knowledge about how he knew to substitute the exact amount of drugs without specifically knowing what amount of drugs to exchange in the shipping container before[]hand." *Id.*[5]

## III.   LEGAL STANDARD

### A.   Standard of Relief Pursuant to 28 U.S.C. § 2255

Mr. Branford's right to collateral relief is governed by 28 U.S.C. § 2255, which provides: "A prisoner in custody under sentence of a court established by an Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).  Relief under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Cuoco v. United States*, 208 F.3d 27, 29 (2d Cir. 2000) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).  Although § 2255, by its terms, provides grounds for attacking "the sentence," the term "sentence" has been interpreted as a generic term encompassing all of the proceedings leading up to the sentence, including the conviction.  *See, e.g., Hall v. United States*, 58 F.4th 55, 58 (2d Cir. 2023) (vacating a conviction under § 2255).

---

[5] Because Mr. Branford is proceeding *pro se*, the Court has also considered the materials attached to Mr. Branford's submissions at Dkt. Nos. 277 and 281, even though they were filed after the deadline for him to file a reply to the Opposition.  They do not materially impact the Court's assessment of the Petition: they do not show that he is entitled to relief or to an evidentiary hearing.  In a motion for reconsideration of an order of the Court denying Mr. Branford's application to take discovery, he asks for an extension of his deadline to reply to the Government's Opposition.  Dkt. No. 280.  But Mr. Branford had the opportunity to reply to the Opposition and did so through his supplemental memorandum of law and his Affidavit, both filed after the service of the Opposition.  He does not get another shot at yet another reply.  *See* Dkt. No. 270.

"Because requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995), *abrogated on other grounds by Mickens v. Taylor*, 535 U.S. 162 (2002). "[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Frady*, 456 U.S. 152, 165 (1982). Even constitutional errors will not be redressed through a § 2255 petition unless they have had a "substantial and injurious effect" that results in "actual prejudice" to the petitioner. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637 (1993) (citations omitted); *Underwood v. United States*, 166 F.3d 84, 87 (2d Cir. 1999) (applying *Brecht's* harmless-error standard to a § 2255 petition).

Section 2255 "may not be used as a substitute for direct appeal." *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993) (citing *Frady*, 456 U.S. at 165). Thus, "[i]n general, a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review." *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) (citation omitted). That rule does not generally apply, however, to claims of ineffective assistance of counsel. *See Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010) ("[A] petitioner may bring an ineffective assistance of counsel claim [in a § 2255 motion] whether or not the petitioner could have raised the claim on direct appeal." (citing *Massaro v. United States*, 538 U.S. 500, 509 (2003))).

Because Mr. Branford is proceeding *pro se*, the Court must construe each of his submissions in support of the motion "liberally to raise the strongest arguments it suggests." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)).

### B.   When an Evidentiary Hearing is Required

Pursuant to Rule 8(a) of the Rules Governing § 2255 Proceedings for the United States District Courts, if a § 2255 motion is not dismissed on preliminary review, the "judge must review

the answer, any transcripts and records of prior proceedings, and any materials submitted under

Rule 7 to determine whether an evidentiary hearing is warranted."  Section 2255(b) requires a district

court to hold an evidentiary hearing on a petitioner's claims "[u]nless the motion and the files and

records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b);

*see also McLean v. United States*, Nos. 12-cv-1954, 12-cv-7362, 12-cv-7559, 08-cr-789, 2016 WL

3910664, at *8 (S.D.N.Y. July 31, 2016) ("[A] hearing is not required 'where the allegations are

insufficient in law, undisputed, immaterial, vague, palpably false or patently frivolous.'" (quoting

*United States v. Malcolm*, 432 F.2d 809, 812 (2d Cir. 1970))).

 "To warrant a hearing, the motion must set forth specific facts supported by competent

evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle

[the petitioner] to relief."  *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013) (citations

omitted).  "Airy generalities, conclusory assertions and hearsay statements will not suffice . . . ."

*Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (quoting *United States v. Aiello*, 814 F.2d

109, 113 (2d Cir. 1987)).  Nor will allegations that are "vague, conclusory, or palpably incredible."

*Gonzalez*, 722 F.3d at 130.  As the Second Circuit has explained:

> The procedure for determining whether a hearing is necessary is in part analogous to
> . . . a summary judgment proceeding.  The petitioner's motion sets forth his or her
> legal and factual claims, accompanied by relevant exhibits: e.g., an affidavit from the
> petitioner or others asserting relevant facts within their personal knowledge and/or
> identifying other sources of relevant evidence.  The district court reviews those
> materials and relevant portions of the record in the underlying criminal proceeding.
> The Court then determines whether, viewing the evidentiary proffers, where credible,
> and record in the light most favorable to the petitioner, the petitioner, who has the
> burden, may be able to establish at a hearing a *prima facie* case for relief.  If material
> facts are in dispute, a hearing should usually be held, and relevant findings of fact
> made.

*Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (internal citations omitted).  However, "a

district court need not assume the credibility of factual assertions, as it would in a civil case, where

the assertions are contradicted by the record in the underlying proceeding."  *Id.* at 214.

IV.    DISCUSSION

A.    Claim of Ineffective Assistance of Counsel

Mr. Branford's motion does not come close to meeting the standard required to show that his counsel was ineffective. It is well established that the Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the familiar two-part test for determining whether an attorney's representation was ineffective.

First, the defendant must demonstrate that the representation "fell below an objective standard of reasonableness." *Id.* at 688. Under this first prong of *Strickland*, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The court examines the reasonableness of counsel's actions, keeping in mind that "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

Second, the defendant must demonstrate that the deficient representation prejudiced him. *Id.* at 694. The prejudice component of *Strickland* asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gueits v. Kirkpatrick*, 612 F.3d 118, 122 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "If it is easier to dispose of an ineffectiveness claim on the ground of

25

lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697.  To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a plausible claim of ineffective assistance of counsel, not that "he will necessarily succeed on the claim." *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (quoting *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993)).

Mr. Branford has not shown that he has a plausible claim of ineffective assistance of counsel.  As the Government argues in the Opposition, the Petition itself contains nothing more than conclusory assertions regarding his counsels' alleged ineffectiveness.  The Petition does not even identify which lawyer was allegedly ineffective.  Given the large number of lawyers who represented Mr. Branford in the run-up to his guilty plea and thereafter, that lack is damning.

Moreover, in his Petition, Mr. Branford does not identify what investigation his counsel failed to conduct.  Mr. Branford asserts in his Affidavit that he, Mr. Branford, was not aware of certain shipping records, which he asserts contain discrepancies, until after he pleaded guilty.  But he has not suggested that his counsel was unaware of those documents prior to the plea.  As noted above, when the documents were discussed during a conference with the Court, the Government asserted that the documents had been produced during discovery, and Mr. Branford himself had them no later than the time when he moved to withdraw his plea.[6]  So, again, Mr. Branford has not identified which counsel was allegedly ineffective, or provided facts suggesting that any of his lawyers conducted an inadequate investigation.  At most, Mr. Branford has presented a self-serving affirmation that he personally was unaware of these pieces of discovery prior to his plea, not that his counsel was ineffective by failing to conduct an investigation that would have unearthed the records.

---

[6]  And in his July 2, 2017 letter to the Court, the defendant described a bill of lading "which was disclosed during discovery."  Dkt. No. 153.

In his Affidavit, Mr. Branford identifies a specific alleged deficiency in the way in which Mr. Barket used the shipping records during the *Fatico* hearing. But Mr. Branford's assertion that Mr. Barket "only argued a discrepancy concerning essentially the DHS Agent Peter Didato's knowledge about how he knew to substitute the exact amount of drugs" is factually untrue. Affidavit at 2. As described above, Mr. Barket made an extensive argument to the Court that, based on the shipping records, the Court should conclude that no cocaine was in the vessel searched by Agent Didato. Mr. Branford's argument that Mr. Barket failed to present that argument to the Court is factually untrue. None of the other assertions in the Affidavit demonstrate an entitlement to a hearing or *habeas* relief.

In his Petition, Mr. Branford asserts that his counsel "failed to establish movant's citizenship which affected pretrial and post guilty plea arguments to movant's detriment . . . ." Petition at 4. But the allegation does not merit relief. As the Government argues in its Opposition, "the country of Branford's citizenship is not, as he claims information 'not previously available to movant.'" It is information known to him. And Branford has not suggested any grounds to infer that he was in any way prejudiced by this alleged failure.

Mr. Branford's Petition and supporting documents do not show that he is entitled to relief. As described above, this Court found, and the Second Circuit affirmed, that Mr. Branford pleaded guilty knowingly and voluntarily. "A defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to events occurring prior to the entry of the guilty plea. He [or she] may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he [or she] received from counsel was not within [acceptable] standards." *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S. Ct. 1602, 1608, 36 L.Ed.2d 235 (1973). "[B]ecause Petitioner voluntarily pled guilty, Petitioner is barred by *Tollett* from bringing his other three ineffective assistance of counsel claims . . . that counsel did not show Petitioner discovery material." *Devault v. Griffin,* No. 16-CV-7281 (VB)(LMS), 2020 WL 5217149, at *10–11 (S.D.N.Y. Jan. 22,

2020), *report and recommendation adopted,* No. 16 CV 7281 (VB), 2020 WL 5209731 (S.D.N.Y. Aug. 31, 2020).

### B.    Actual innocence

Mr. Branford has not presented a credible or compelling claim of actual innocence.  "A claim of actual innocence must be both 'credible' and 'compelling.'"  *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012) (quoting *House v. Bell,* 547 U.S. 521, 538 (2006)).  A credible claim "must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'"  *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 865, 130 L. Ed. 2d 808 (1995)).  "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'"  *Id.* (quoting *House*, 547 U.S. at 538).

Mr. Branford failed to make a showing of actual innocence that would entitle him to *habeas* relief.  At the outset, there are many pieces of evidence that were presented to the Court during the course of the case that support the conclusion that Mr. Branford is indeed guilty of this offense: most importantly, Mr. Branford's own words.  During a suppression hearing, Mr. Branford testified that his voice was captured in a recording in which he questioned and threatened a co-conspirator about the cocaine shipment that went missing when it was seized by the Government.  Suppression Hearing Tr. at 17:11-24.

During his guilty plea hearing, Mr. Branford swore under oath as follows:  "I'm agreeing that I knowingly and intentionally, along with others, imported more than five kilograms of cocaine into the United States from Panama."  Plea Hearing Tr. at 23:4-7.  As this Court found, and the Second Circuit reaffirmed, Mr. Branford pled guilty because he is in fact guilty.  *See* Withdraw Plea Hearing

Tr. at 49:15-16 ("Mr. Branford's guilty plea was entered voluntarily, knowingly, and intelligently");

*United States v. Branford,* 833 F. App'x 902, 903–04 (2d Cir. 2020) ("Branford did not plead guilty

blindly:  As his plea deal put it, Branford 'decided to plead guilty because he is in fact guilty.'").

 And at sentencing, even after he had reviewed the shipping records that he focuses on so

heavily in connection with his Petition, Mr. Branford stated "I would like to reiterate that I am

accepting responsibility as to this current crime."  Sentencing Hearing Tr. at 97:2-3.  All of this on

top of the ample evidence that was presented to the Court regarding Mr. Branford's criminal

conduct in his suppression hearings and the *Fatico* hearing.  The Court has no concern that Mr.

Branford is in fact innocent.

 But more importantly in this context, Mr. Branford has not presented support for a finding

of "actual innocence."  The information on which he bases his claim is neither credible nor

compelling.  His claims of actual innocence are based on airy generalities that are unsupported by

fact, with the exception of the records attached to his Supplemental Memorandum.  The Court had

the opportunity to review in depth the shipping records that Mr. Branford asserts show that there

was no cocaine on the vessel during the *Fatico* hearing.  Having reviewed the records presented to

the Court by Mr. Branford during the hearing and the testimony of Agent Didato, the Court found

that law enforcement had found drugs in the shipping container in the Port.  Mr. Branford's self-

serving assertion that there was no underlying cocaine is conclusively contradicted by the record.

Mr. Branford was captured on a wire discussing the missing cocaine.  Fundamentally, Mr. Branford

has presented no compelling or credible evidence of his innocence.  It is noteworthy that even after

his plea, he did not claim that he was innocent.  He claimed that venue was improper.  Mr. Branford

sees in the shipping record some discrepancies—but they do not show that what he previously said

before—that he was selling cocaine—was false.  Mr. Branford has not substantiated his claim of

actual innocence.

### C.    Alleged Government Misconduct

Finally, Mr. Branford asserts that the Government violated its obligations under *Brady v. Maryland* by manufacturing evidence.  Specifically, Mr. Branford claims that the "cocaine was non-existent, and evidence utilized by the government was from another criminal case."  Mr. Branford's claim is procedurally barred.  Mr. Branford's plea agreement contained a waiver of his appeal rights specifically targeted to a failure by the United States to comply with its obligations under *Brady*.  "Such waivers are enforceable where . . . the defendant entered into the plea agreement knowingly and voluntarily."  Mr. Branford's plea was knowing and voluntary.

Furthermore, Mr. Branford is barred from bringing this claim because he failed to properly raise it on appeal and the Petition does not adequately address the failure.  *See United States v. Branford,* 833 F. App'x 902, 904 (2d Cir. 2020) (holding that, "[i]n his reply brief, Branford raises additional arguments involving ineffective assistance of counsel and violations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), but we decline to consider issues raised for the first time in a reply brief.")  Federal prisoners may not employ section 2255 as a substitute for direct appeal.  *See, e.g., Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.").  "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'"  *Bousley v. United States*, 523 U.S. 614, 622, 118 S. Ct. 1604, 1611, 140 L. Ed. 2d 828 (1998).  Mr. Branford's submissions do not demonstrate the type of cause or prejudice that might overcome his procedural default.[7]

---

[7] While Mr. Branford's claim of Government misconduct with respect to the production of discovery materials is procedurally barred, the Court notes that this argument in his Petition is not supported by the evidence presented by him to the Court in connection with the Petition or by the record of the case as a whole.  The record shows that Mr. Branford's counsel was provided discovery—including shipping records—prior to his plea.  The Government made that proffer during the conference discussed earlier in this opinion.  Mr. Branford wrote the Court regarding a bill of lading

## V.    CONCLUSION

For the reasons stated above, Mr. Branford's petition is denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  Mr. Branford has not made a substantial showing of the denial of a constitutional right, so the Court denies a certificate of appealability under 28 U.S.C. § 2253.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 269 and 281 in *United States v. Joel Branford,* 1:14-cr-0225-GHW.  The Clerk of Court is further directed to enter judgment for the Respondent and to close Mr. Branford's civil action, *Branford v. United States*, Case No. 1:22-cv-1264-GHW.  Finally, the Clerk of Court is directed to mail a copy of this opinion to Mr. Branford.

SO ORDERED.

Dated:  May 23, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

provided to the defense "during discovery."  Dkt. No. 153.  There is no question that Mr. Branford's counsel had the documents that he presents in his Supplemental Memorandum no later than at the time of his motion to withdraw his plea, because the documents were filed on the docket of the case in connection with that motion practice.  And, as noted, Mr. Barket used them to support his argument during the *Fatico* hearing.  Even if Mr. Branford's counsel did not provide the documents to Mr. Branford earlier, as he asserts in his Affidavit, the Petition, its supporting documents, and the record of the case as a whole do not support the conclusion that the Government failed to provide documents timely to his counsel.